## Case No. 2,190.

### BURR v. DURYEE et al.

[2 Fish. Pat. Cas. 275.] [1]

Circuit Court, D. New Jersey. Sept. Term, 1862. [2]

PATENTS—HAT BODIES—INFRINGEMENT—GRANTS BY PATENTEE—ESTOPPEL OF GRANTEE—EQUITY—RELIEF—FORFEITURE.

1. The value of the franchise granted to a patentee depends on the mode in which he may find it most profitable to exercise it.

2. He has a right to divide out his monopoly in the category of its locality, and may thus create any number of exclusive franchises, each bounded by the limits of a city, county, or state,

---

[3] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Samuel S. Fisher, Esq., and here reprinted by permission.]

[2] [Affirmed in Burr v. Duryee, 1 Wall. (68 U. S.) 531.]

where the patentee himself may be treated as a trespasser, if he interferes.

[Cited in Heaton Peninsular Button-Fastener Co. v. Dick, 55 Fed. 25.]

3. He may find it most profitable, as in the case of a labor-saving machine, where a cheaper article may engross the whole market, to retain the monopoly wholly under his own control and that of his agents or licensees.

4. In other cases the patentee may have the value of his franchise. not in making the machine, but in its use, either wholly by himself or by his special licensees. paying him a certain toll, tariff, or annuity. for a license to use a certain number of the machines invented.

[Cited in Heaton Peninsular Button-Fastener Co. v. Dick, 55 Fed. 25.]

5. Equity may relieve against a forfeiture; it never inflicts one.

6. The recitals in a deed can estop no one but parties or privies who are claiming under or against it, and in a controversy founded upon its covenants.

[Cited in Baltimore Car-Wheel Co. v. North Baltimore Passenger Ry. Co., 21 Fed. 50.]

7. The purchase of a license forms no bond or allegiance to the patentee; or an estoppel to the licensee from averring or proving any defense in an action for the infringement of a patent, which any other person might use.

[Cited in Baltimore Car-Wheel Co. v. North Baltimore Passenger Ry. Co., 21 Fed. 50.]

8. Previous to the act of July 4, 1836 [5 Stat. 117], which established a board or bureau composed of competent examiners, patents had frequently been adjudged invalid from the insufficiency of the specification; usually because, by inadvertency, accident, or mistake, the patentee had not sufficiently separated the old from the new, and had claimed more than he was entitled to. Few inventors or even learned lawyers, were capable of correctly and clearly setting forth in a specification the proper limits of the just claim of the invention. Section 13 of the act of July 4, 1836, was intended to remedy this evil by permitting the patentee to surrender his defective patent, and have it renewed in proper form, under the limitations named in the section. This valuable and just privilege given to inventors has been much abused by their assignees. Since the date of the act of 1836, not only the patent office but the bar can furnish gentlemen fully competent to the task of drawing up proper specifications, and but little liable to commit blunders from inadvertency. Nevertheless, this privilege of surrender and reissue is resorted to more frequently than ever. Section 13 of the act of 1836 does not absolutely require that the suggestion, that a patent is inoperative and void, should be made under oath; nor does it appear that the patent office requires that the fact should have been judicially ascertained.

[Cited in Cahart v. Austin, Case No. 2,288.]

9. Taylor was not the inventor of the conical cover used in hardening hat bodies formed on a cone, nor rubbing them by a reciprocating motion, but merely of a certain combination of devices to produce a certain effect. Both the operation and the result were well known, and the invention consisted only of the devices combined to perform the operation and produce the result. It was open to every other person to make any other combination of devices to perform the operation, which was not a mere colorable adoption of the patentee's combination.

[See note at end of case.]

[Cited in Wells v. Jacques, Case No. 17,399.]

These were three bills in equity filed by the same complainant [Henry A. Burr] to restrain the same defendants [Peter S. Duryee, Henry A. Jacques, and Henry W. Duryee]

from the infringement of three separate patents. [Bills dismissed.]

The first bill charged the infringement of letters patent [No. 4,472] granted to Henry A. Wells, April 25, 1846, for an "improvement in the machinery for making hat bodies; and 'in the process of their manufacture." This patent was surrendered and reissued in two divisions, one dated September 30, 1856, and numbered 396, and the other dated October 7, 1856, and numbered 400. Reissue No. 396 having been extended and assigned to complainant, by the administratrix of the patentee, was again reissued in two separate patents, December 4, 1860, which reissues were numbered 1086 and 1087.

The claims of the original patent were as follows: "What I claim, etc., is the arrangement of the two feeding belts (bb$^1$), with their planes inclined to each other, and passing around the lips (dd$^1$), formed substantially as described, the better to present the fibres to the action of the rotating brush (F), as described in combination with the rotating brush and tunnel or chamber (M) which conducts the fibres to the perforated cone or other former placed in front of the aperture or mouth thereof, substantially as herein described. I claim the chamber (M) into which the fibres are thrown by the brush, in combination with the perforated cone or other 'former' (o) placed in the front of the delivery aperture thereof, for the purpose and in the manner substantially as herein described, the said chamber being provided with an aperture (N) below and back of the brush, for the admission of a current of air to aid in throwing and directing the fibres on to the cone or other former, as described. I also claim the employment of the hinged hood (S) to regulate the distribution of the fibres on the perforated cone or other former, as described. And I also claim providing the lower part or delivery aperture of the tunnel or chamber with a hinged flap (q), for the purpose of regulating the delivery of the fibres to increase the thickness of the bat where more strength is required, as herein described, in combination with the hood, as herein described."

The claim of reissue No. 396 was as follows: "What is claimed herein as the invention of the said Henry A. Wells, deceased, is forming bats of fur fibres, by throwing the fur in properly regulated quantities, substantially as herein described, against a section of the circumference of a perforated cone or other form, as the same is rotated to present in succession every part of the circumference thereof to the current of impelled fur, to obtain the required thickness of bat, substantially as described, in combination with the method of holding the fibres on to the cone or other form during the operation, substantially as described, and for the purpose specified."

The disclaimer and claims of reissue 1086 were as follows: "Having thus described the mode of application of the said invention of the said Henry A. Wells, as the same was successfully reduced to practice by him, I do not wish to be understood as limiting the claim of my invention to such mode of application; as other modes may be devised having the same mode of operation or principle, and only differing from it in form, or in the substitution of equivalent means. Nor do I wish to be understood as making claim therein to the combined process of forming and hardening hat bodies on pervious cones or other analogous 'formers' preparatory to taking them off in a suitable condition for the after process of sizing by felting, as this is the subject of another patent. What I claim as the invention of the said Henry A. Wells, in machinery for forming bats of fur fibres in the manufacture of fur hat bodies, is the mode of operation, substantially as herein described, of forming bats of fur fibres of the required varying thickness, from brim to tip, which mode of operation results from the combination of the rotating picking mechanism, or the equivalent thereof, the pervious 'former' and its exhausting mechanism, or the equivalent thereof, and the means for directing the fur-bearing current, or the equivalent thereof, as set forth. I also claim the combination of the rotating picking mechanism, or the equivalent thereof, the pervious former with its exhausting mechanism, and the lower deflector, substantially as described, to regulate the deposit of the fur fibres on the lower part of the former, as described. I also claim the combination of the rotating picking mechanism, or the equivalent thereof, the pervious former with its exhausting mechanism, and the upper deflector, substantially as described, to regulate the deposit of the fur fibres on the tip of the pervious former, as set forth. And, finally, I claim the combination of the rotating picking mechanism, the pervious former with its exhausting mechanism, and the means described, or the equivalent thereof, for inducing a current of air to aid in carrying and giving direction to the fur, and insuring its proper deposit on the surface of the pervious former, as required, as set forth."

The claim of reissue 1087 was as follows: "What I claim as the invention of Henry A. Wells, is the combined process of forming fur hat bodies by depositing fur fibres to a suitable thickness on the surface of a pervious former of the required shape, and holding them thereon by the pressure of the surrounding air as they are deposited, and then hardening or partially felting the bat so formed, and while it is held by suitable pressure on the surface of the former, to give it the required consistency to admit of removing it therefrom in a suitable condition for the after process of sizing by felting, as set forth."

The second bill charged the infringement of letters patent granted to Alva B. Taylor

March 18, 1856, for an "improvement in machinery for making hat bodies." This patent was assigned to complainant, and was reissued August 21, 1860.

The claim of the original patent was as follows: What I claim as my invention, and desire to secure by letters patent is, the arrangement for hardening the hat body in a dry state, by machinery operating substantially as herein set forth."

The claim of the reissue was as follows: "What I claim as my invention is the combination of a vibrating concave surface, substantially as described, with an exhausted pervious cone, on which the hat of flocculent fibres is held by the pressure of the surrounding air, substantially as and for the purpose specified."

The third bill charged the infringement of letters patent [No. 9,484] granted to Lansing E. Hopkins, December 21, 1852, and subsequently assigned to complainant.

The claims of this patent were as follows: "I do not claim the conical vibrating rollers for the purpose of felting or compressing a bat, or the cone separately, as that is well known; but I claim combining the hardening rollers with the perforated cone, by means of a yielding or hinged frame, in which they are placed, substantially in the manner and for the purpose specified. I also claim giving to said rollers, in combination with said perforated cone, a vibrating endwise motion. as well as a rotary motion, substantially as described and for the purpose set forth. I also claim blowing the exhaust air from the former, f, into the chamber, d, for the purpose and in the manner described. And I also claim the mode of forming the steam pipe outlet, as above specified, by covering the steam pipe with cloth, and incasing it with an outer metal case. I also claim covering the perforated cone, preparatory to a deposition of fur thereon, with a covering of thin cloth, easily pervious to air, upon which the fur is to be deposited—said cloth, or fabric, to be removed at each operation, with the hat body deposited thereon."

The main controversy related to the methods of forming "bats" or hat bodies, by depositing the fibers of fur or wool upon a cone or "former." In 1833, one T. R. Williams had invented and patented a machine consisting of a carding apparatus, by which the fibers were disintegrated, a fan by which they were blown from the carding machine on to a revolving cone or "former," and of the cone or "former," which was perforated, and from which the air was exhausted by a fan placed below it, so that the fibers would be drawn toward and deposited upon it. Wells substituted for the carding machine a rapidly revolving brush which disintegrated the fibers and threw them toward the cone. He placed a trunk or trough between this brush and the revolving cone, which trunk was provided with a hinged hood, flap, or deflector, at its outer end, or that nearest the former, to direct the fibers and deposit them at pleasure on any part of the cone. The cone, and the apparatus for revolving and exhausting the air from it, was substantially the same as that used by Williams. The defendants claimed under letters patent to Seth Boyden, dated January 10, 1861. Boyden substituted a rapidly revolving picker for the brushes of Wells, and in front of this, he placed a short curved guide-plate or hood, by means of which he directed the fibers to any part of the cone. He uses the revolving cone of Williams and Wells, but dispensed entirely with the trunk or trough employed by the latter as intermediate between the picker and the cone. Wells claimed, that having described one mode of guiding the fur to the cone, to wit: the trunk, he was entitled to claim any method for producing the same result; and insisted that the short guide-plate of Boyden, which merely gave direction to . the fibers, which were blown thence through the open air, was the equivalent of his trunk, which conveyed the fibers from the picker to the cone, and there gave direction to them by the deflector or hinged cap at the outer end.

C. M. Keller and George Gifford, for complainant.

C. Parker and George Harding, for defendants.

### Henry A. Wells Patent.

GRIER, Circuit Justice. The complainant is assignee of a patent granted to Henry A. Wells April 25, 1846, for an "improvement in the machinery for making hat bodies, and in the process of their manufacture." This patent was surrendered by the owners in 1856, and reissued in two separate and distinct patents, one for the improved machine and the other for the process. In 1860, these patents were extended for a term of seven years; and afterward, in December, 1860, they were again surrendered and reissued, with what were alleged to be amended specifications. This bill charges that by a contract under seal made between the owners of this patent and the parties representing the present respondents, on November 7, 1848, they were authorized to "use either one or two machines constructed according to said patent, with all improvements," etc., for all time to come, to be used in the city of Newark, and there only, and by one manufacturing concern, and to be used only for hats manufactured by them, and not in manufacturing hat bodies for any other persons, or for sale in an unfinished state. For this the licensees were to pay five hundred dollars a year, in quarterly installments, so long as they continued to use the machines; and in case the machines were used contrary to the terms of the license, or the payments not made within thirty days after they became due, "this contract shall cease and become void, and shall be thereby absolutely canceled." The bill then charges that the respond-

ents have no right or title to use the said two machines, or any other machines, under said agreement, because they have become void and canceled, and annulled by the acts of the parties; that the complainant has given notice to respondents that he considers the agreements annulled, and has ever since refused to accept the payment under them. The breaches of the agreement charged on the respondents are, that they have constructed, without authority, two machines in addition to the two so furnished by the complainant, one of which he had replaced by a new one, with which they were manufacturing hat bodies, which they sell in an unfinished state, in violation of their license. It is charged, also, that the respondents have four other machines, differing in some of the details of their construction, on which they manufacture hat bodies for sale, and thus compete with the complainant.

The respondents, in their answer, do not deny the validity of the letters patent originally granted to Wells, and which they are licensed to use. They deny that they have used more than two machines, or sold hat bodies made on them, or in anywise broken the covenant of the deed of license. They aver that the quarterly payments were regularly made up to January 1, 1861, and until complainant refused to receive them, and that they are always ready to pay the annuity according to the letter of their contract. The evidence in the case fully supports these allegations of the answer, and raises the first question to be considered in the case, namely: Have the respondents forfeited their contract, and the protection of their license, by a breach of its conditions, so that the complainant has now a right to treat them as trespassers, and demand the interposition of a court of equity to restrain them from using their two machines according to the contract? On this point, I think the complainant has failed to establish any right to an injunction, or any other remedy, having suffered no wrong. The value of the franchise granted to the patentee depends on the mode in which he may find it most profitable to exercise it. He has a right to divide out his monopoly, "to make, use, and vend to others to be used," the thing patented, in the category of its locality, and may thus create any number of exclusive franchises, each bounded by the limits of a city, county, or state, where the patentee himself may be treated as a trespasser, if he interferes. Or he may find it most profitable, as in case of a labor-saving machine, where a cheaper article may engross the whole market, to retain the monopoly wholly under his own control and that of his agents or licensees. A plow or reaping machine has its value, not in the exclusive use, but in the profits from an exclusive right to manufacture and sell the machine to others to be used. The patentee can not have any right to use that machine which he has sold to another to use. But in cases where

the mere making and selling the machine to others to use would afford a very small compensation—as those who would purchase would have all the profit of supplying the market with a cheaper article—the patentee has the value of his franchise, not in making the machine, but in its use either wholly by himself or by his special licensees paying him a certain toll, tariff, or annuity, for a license to use a certain number of the machines invented. The invention of Wells is a labor-saving machine, to be used in a certain manufacture. All the manufacturers of hats, who supply the market with that article, and who could afford to pay a high price for the machine, would not exceed one or two hundred. The most profitable enjoyment of the franchise would evidently consist in a license to use the machine, for which the manufacturer could well afford to pay a share of the profits. Such a licensee may either construct his machine for himself, or buy it from the patentee, if he sees fit to construct it. Whether the machine be constructed by one or the other is but an accident of the contract, which may be made the subject of stipulation, if the parties think it of importance sufficient to be specially provided for. The contract, in this case, authorizes the respondents to use two machines, "constructed according to said patent," etc. It does not provide for their construction, or any price or profit to be paid to the constructor. The licensee may use two at all times, whether constructed by himself or another. If he constructs machines, and sells them to others to be used, he is an infringer of the patent, and liable to an action. If he uses but two, he is within the letter and spirit of his contract. If he should construct a dozen, yet if he uses but two, he has not broken his contract; he may possibly be liable to nominal damages, as any person who constructs a patented machine which he does not use or sell to others. If the complainant can show that he is injured by the defendant's having in his possession worn-out machines in his garret, he can bring his action, and, on proof of damage, may recover it in a court of law. But he has not made out a case for the interference of a chancellor. Equity may relieve against a forfeiture; it never inflicts one. So far, therefore, as the extent of this license is concerned in this case, the complainant has wholly failed to establish a case which demands relief from a court of equity.

2. This contract between the parties evidently was not intended to restrain the respondents from manufacturing hat bodies in any other way than on these two machines. They were consequently at liberty to manufacture and sell as many as they pleased, either by the old method, or by any new machine which might be invented. It is not denied that for this purpose, the respondents use a machine invented by Boyden, and patented to him January 10, 1860. Since this machine was invented and put in operation,

the complainant has surrendered his Wells patent a second time, and had it reissued with what is called an amended specification. It is supposed now to be made broad enough to suppress all other machines that can be invented. It has been contended, with apparent seriousness, that the defendants are estopped to deny the validity of this renewed patent, by the recitals in the contract. But what rule of law or equity can be found to support such a pretense, it is hard to perceive. The respondents affirm the contract, and claim its protection; it is the complainant who seeks to nullify it. How it could be declared void by one party, and yet estop the other, has not been explained. If the defendants were setting up a plea to an action for the money due by the contract, they might be estopped by the recital of the deed to deny that the complainant is the assignee of the Wells patent; and if they continued to enjoy the benefit of the monopoly, they would be estopped from denying the validity of the patent. But the recitals in a deed can estop no one but parties or privies who are claiming under or against it, and in a controversy founded on its covenants. The respondents had a right to purchase and use any other machine. If such machine should be challenged as an infringement of a prior patent, they have a right to defend themselves by any plea that any other person might use. Their purchase of a license forms no bond of allegiance to the patentee, or an estoppel from averring and proving the truth.

3. Previous to the act of July 4, 1836, which established a board or bureau composed of competent examiners, patents had frequently been adjudged invalid from the insufficiency of the specification; usually because, by inadvertency, accident, or mistake, the patentee had not sufficiently separated the old from the new, and had claimed more than he was entitled to. Few inventors, or even learned lawyers, were capable of correctly and clearly setting forth in a specification the proper limits of the just claim of the invention. Section 13 was intended to remedy this evil, by permitting the patentee to surrender his defective patent, and have it renewed in proper form, "whenever it shall be inoperative or invalid, by reason of a defective or insufficient description or specification, or by reason of the patentee claiming in his specification as his own invention more than he had a right to claim as new, if the error has arisen by inadvertency, accident, or mistake," etc. This valuable and just privilege given to inventors has been much abused by their assignees. Since the date of this act, not only the patent office but the bar can furnish gentlemen fully competent to the task of drawing up proper specifications, and but little liable to commit blunders from inadvertency. Specifications now seldom issue from the patent office to which such an imputation can be made. Nevertheless, this privilege of surrender and reissue

is resorted to more frequently than ever. Formerly, when in course of investigation in a court of justice, it was discovered that a patent was invalid for any of the reasons mentioned in the act, it was resorted to for protection. Now, after a patent has been declared to be valid, the specification without defect, and the claim for nothing more than the invention, after it has undergone examination for many years, and courts and juries have decided that the patent is not invalid, through inadvertency, accident, or mistake, the assignees come forward and make oath, without scruple, that their patent is defective and invalid.

For thirty years past, there is hardly any operation in agriculture or manufactures which has not been the subject of numerous labor-saving machines. Those who have been successful in contriving a machine that will supersede all prior inventions have to exercise great care and caution in stating the peculiar nature of their invention, and the combination of devices which distinguish it from all others which preceded it, so that they may not be found to claim what other inventors, though unsuccessful, may have exhibited in their patents. Inventors often receive but a small portion of the profits of their invention. It requires capital and enterprise to get the machine into general use and demand. When it has established its value, it has to contend with infringers. When these have been suppressed by the arm of the law, after the patent has been extended (often with small profit to the inventor or his heirs), it becomes an object of the fortunate and enterprising assignees to protect their monopoly by suppressing all other inventions for the same purpose. If another inventor has succeeded in inventing a machine equal or even inferior to theirs, he must be frightened off the course by threats of ruinous litigation, and made willing to sell his new invention for a small sum, that it may be suppressed by them. An experience of some thirty years on the bench enables me to say that I have known this scheme to be practiced more than once, to the detriment of the public, amounting to millions. To enter into a minute investigation of the numerous machines, patents, and specifications connected with this case, would be extremely tedious and unintelligible, without models or drawings. I shall, therefore, only state the results of a careful consideration of the case, without endeavoring to vindicate them by argument. The invention of Wells is well set out in his original patent of 1847, and carefully guarded against claiming anything which would render it inoperative or invalid, so far as the machine itself is concerned. The combination of devices essential to the successful operation of the machine, was the connecting of the rotatory brush with the tunnel or chamber of the form described in combination with the cone placed in front of the delivery aperture. This

tunnel, and its peculiar form, was the leading feature of the invention. It was undoubtedly, as to its form and position, a valuable improvement upon previous machines, by means of which the fur could be cast on the cone. But as a hat body requires to be made of unequal thickness in certain parts, a hinged hood was added to regulate the distribution of the fibers. It was attempted to make the device automatic; but it was soon discovered that it could not be used to advantage without having a skillful operator to guide it. When so operated on, it did succeed in making hat bodies cheaper than they could be manufactured by hand, but the machine was not satisfactory to the trade, and not completely successful. To accomplish the desideratum, many plans were suggested and tried, at great expense to the owners, by the original inventor, Wells, and by other machinists, but without success. Messrs. Burr and Taylor, after many expensive experiments, finally devised the plan of making this chamber or trunk of thin sheet metal, in combination with a moveable top, by means of which the deposit of fibers might be regulated by adapting the form of the delivery aperture to any size required. With this improvement the machine is now in successful operation, and is no doubt of great value.

The machine invented by Boyden is certainly inferior to it, but its claims to originality and invention are even greater than that of Wells. Compared with the machine as Wells left it, without Taylor and Burr's improvement, it is perhaps equal if not superior. But that is a question of no importance. It has not the combination of devices first invented by Wells, nor has it any substantial identity with it; although it produces the same effect, it is not in the same way nor substantially in the same way. Its modus operandi is entirely different. There is nothing to be found in the Wells patent to suggest the peculiar device invented by Boyden. No one, who looks at the two machines with a knowledge of the state of the art, and wherein consists the peculiarity of the Wells machine, can say that Boyden's is an infringement. In order to do this, he must assume that the Wells machine is not a combination of devices to effect a particular purpose in a cheaper way, but an abstraction or generalization broad enough to include all combinations of devices to produce the same effect by any means whatever. The reissued patent, on which this bill is founded, has been got up since the invention of the Boyden machine, and as appears by the evidence after a careful examination of it, and for the evident purpose of suppressing it. The most astute counsel and experts have been employed to surround this machine or invention of Wells with a fog of nebulous rhetoric, and to make this concrete machine appear a transcendental abstraction, and magnify it into a monopoly, not of a machine, but of a principle, effect, or result. I have not time to analyze more particularly this bank of fog with which this machine has been enveloped. It must suffice to say, that the invention of Boyden is not an infringement of the invention of Wells, and if it be an infringement of this reissued patent, the patent is void.

5. As to the patent for the process, there is no evidence of any infringement, and if there were, I must say that by testimony now for the first time produced, it is clearly established that Wells is not the first and original inventor or discoverer of the process claimed. It is to be found in an English patent granted to William Ponsford in 1839. Wells is proved to have been in England at the time, and when he afterwards took out his English patent, he did not include a claim to the discovery of this process, as it would have invalidated his patent.

The bill is therefore dismissed with costs.

### Alva B. Taylor's Patent.

In this case the respondents are charged with infringing a patent granted to Alva B. Taylor, in 1856, for a certain new and useful improvement in machinery for making hat bodies. Complainant became owner of this patent in October, 1859. Previous to this, namely, in August, 1859, Seth Boyden (under whom respondents claim) had obtained a patent "for a new and useful improvement in machinery for hardening hat bodies." The complainant, after seeing and examining the invention of Boyden, entered upon his process of suppressing it, by means of amending previous patents, to make them broad enough to cover the new invention, as we have seen in the examination of the preceding case. This Taylor patent was then purchased, and immediately in 1860 surrendered as "inoperative," for the purpose of suppressing Boyden's invention, and the present amended patent taken out, which is expected to be more operative.

Many men are very wise after an event has happened or an invention is made, and can at once demonstrate that it is but a mere piracy of some previous unsuccessful one, or of some patented machine, the specification of which might have been made broad enough to cover all other combinations or devices to effect the same purposes, if the patentee had only thought of it. The inadvertency, accident, or mistake is never perceived till some new machine is put into operation, and the defect in the original specification consists in not being made broad enough to cover combinations of which the first patentee had no conception. Section 13 of the act does not absolutely require that this suggestion, that a patent is inoperative and void, should be made under oath; nor does it appear that the patent office requires that the fact should have been judicially ascertained. On the contrary, these reissues so far as they have come under my notice, have been usually after the courts

have decreed that the original patent is operative and valid. The first great contest which a patent has to meet is with previous unsuccessful inventions; to this end the patentee is careful not to make his specifications too broad, in order to avoid defeat from prior inventors. But when it has succeeded, by means of this narrow specification, in putting down all infringers, and when the monopoly in the hands of some powerful corporation or association has become of great value, the next operation is to suppress all new inventions which might affect the value of the monopoly. All at once, after the original patent has for years sustained itself against all infringers, some ingenious manipulator is employed to reconstruct the specification, and make it broad enough to sweep out of the way all other inventions to effect the same purpose. To this use has the valuable privilege granted by the thirteenth section been perverted. In this case the invention of Taylor was the application of pressure by means of rollers, with a contrivance to give them the reciprocating motion necessary to this process of hardening. He was not the inventor of the conical cover used in hardening hat bodies formed on a cone, nor of rubbing them by a reciprocating motion, but merely of a certain combination of devices to produce a certain effect. Both the operation and the result were well known, and the invention consisted only of the devices combined to perform the operation and produce the result. It was open to every other person to make any other combination of devices to perform the operation, which was not merely a colorable adoption of the patentee's combination. The original specification of Taylor is drawn with sufficient care and judgment to cover all the patentee knew he had invented, and the whole machine as described therein.

A comparison of the devices used in the two machines would be unintelligible without models or drawings. The Taylor patent is but for a form, or rather a combination of known devices, to perform a certain operation and produce a certain desirable effect. The combination used by Boyden is not a mere colorable or substantial adoption of the same combination of devices. It has as much claim to originality as that of Taylor, but it has a vibrating concave surface of cloth, pressing against the cone. Accordingly, the reissued patent to Taylor, or rather to Burr, got up after an examination of Boyden's machine, contained this interpolation in the description of his invention, "A vibrating concave surface held by pressure," etc., etc.; and the claim extended to the "combination of a vibrating concave surface;" then follow the words substantially as described. In a contest with a previous patent, the last words can be called in to qualify the first, and narrow it down to the peculiar combination of devices described; while, in assaulting a new combination, for

the purpose of suppressing it, the claim may be stretched to cover every machine having a "concave vibrating surface," by calling all the other parts "equivalents." It is plain that this interpolation of an abstract generalization, to render the specific description of the concrete machine more elastic, was suggested by an examination of the Boyden machine. If the same construction be given to the claim of Taylor, as it would necessarily invoke in a contest with preceding inventions, to save it from the charge of being too broad, the Boyden machine would be properly pronounced as no infringement; on the contrary, such a construction of it as would include the Boyden machine, would make it void for being too broad. It matters little on which horn of this dilemma the case be put, the result must necessarily be that the bill is dismissed with costs.

### Lansing E. Hopkins' Patent.

This bill charges the respondents with infringing a patent granted in 1852 to Lansing E. Hopkins, which became the property of the complainant in September, 1860, after it had been defeated in a contest with the Wells patent. It has the negative merit of not having been surrendered and renewed to accommodate itself to the state of the arts in 1860. Although as a whole, the machine of Hopkins may be considered worthless, yet it is contended that there are certain combinations of devices claimed in it which are valid claims, and which the Boyden machine, claimed by respondents, infringes. A large museum of exhibits in the shape of machines and models, has been presented to the court, on the argument of this and the two preceding cases. They were absolutely necessary (whether successful or not), to give the court a proper understanding of the merits of the controversies. But although, after a careful examination of them, I have come to a conclusion satisfactory to my own mind, I despair of being able to vindicate it without the use of the same means. I shall therefore only state the result, referring the curious for reasons to those given by Mr. Treadwell, a witness examined in the case. I do not think that the Boyden machine infringes any combination of devices justly claimed in the Hopkins patent. The bill is therefore dismissed with costs.

[NOTE. For other cases involving this patent, see note to Burr v. Cowperthwaite, Case No. 2,188.

[Complainants appealed to the supreme court, which affirmed the decree of the circuit court, dismissing the bills, and, as to the Wells patent, assigned as its grounds that the machine of Boyden did not infringe, and that, as it was not an infringement of the original patent, it could not be an infringement of the reissued patent, for, if the reissue was not for the same invention, it was void. Burr v. Duryee, 1 Wall. (68 U. S.) 531.

[In affirming the dismissal of the bill for infringement of the Taylor patent, the court said

that the combination used by Boyden was not a mere colorable or substantial adoption of the same combination of devices, but had as much claim to originality as that of Taylor, and that consequently there was no infringement. Id. 579.

[As to the Hopkins patent, the court, without giving its reasons, stated that the Boyden machine did not infringe any combination of devices justly claimed by that patent. Burr v. Duryee, 17 U. S. Sup. Ct. Rep. (Lawy. Ed.) 661.]